# EXHIBIT A

STATE OF MICHIGAN
IN THE LIVINGSTON COUNTY CIRCUIT COURT

HP BENSON ASSOCIATION INC., a Michigan nonprofit,

Plaintiff.

Case: 25 30852 cz
Hon: JUDGE McGIVNEY
P-63325

-v-

PARAMOUNT GLOBAL d/b/a
PARAMOUNT, a Delaware corporation, CBS BROADCASTING INC.,
a New York corporation, and CBS INTERACTIVE INC., a Delaware
corporation,

Defendants.

FILED
LIVINGSTON COUNTY CLERK
2025 JUL -1 PM 4: 36

---

Martin H. Leaf (P43202)
Counsel for Plaintiff
33228 W 12 Mile Rd #345
Farmington Hills, MI 48334
248.687.999
leafmartin@gmail.com

---

## COMPLAINT UNDER THE MICHIGAN CONSUMER
PROTECTION ACT FOR INJUNCTIVE AND DECLARATORY RELIEF



"No, I'm not looking for that. I'm looking for fairness. That's all."
— President Trump October 25th, 2020, *Sixty Minutes* Interview.

Plaintiff, HP BENSON ASSOCIATION INC. ("HP BENSON"), by and through undersigned counsel, brings this action for injunctive and declaratory relief against Defendants PARAMOUNT GLOBAL d/b/a PARAMOUNT (together with its affiliates and subsidiaries, "Paramount"), CBS BROADCASTING INC. ("CBS Broadcasting"), and CBS INTERACTIVE INC. ("CBS Interactive") (CBS Broadcasting and CBS Interactive together, and with their affiliates and subsidiaries, "CBS"; Paramount together with CBS, "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1.  This case is about whether media Defendants violated a Michigan statute – The Michigan consumer protection act ("MCPA") – when they failed to reveal the important (i.e. material) facts regarding the *Sixty Minutes* pre-election Presidential candidate(s) interview aired on October 25th, 2020, and another aired on October 7th, 2024 - which President Trump chose not to participate in - alleging bias and continuing deceptive bias against him by *60 Minutes*.

2.  The *Sixty Minutes* 2020 presidential candidates interview included an interview of President Donald J. Trump by *60 Minutes* correspondent Lesley Stahl. That same episode also included an interview of Joe Biden by *60 Minutes* correspondent Norah O'Donnell.

3.  The *Sixty Minutes* 2020 interview of Joe Biden violated the MCPA because Sixty Minutes never revealed the material fact that only Biden was given the questions in advance or substantial information regarding the questions.

4.  Upon information and belief Mr. Biden's answers were also edited to make him seem more mentally competent.

5.  The failure to reveal that only Biden was given information regarding the questions in advance and only Biden's answers were edited to make him

seem more mentally competent was a failure to reveal those material facts, which *tends* to mislead or deceive the consumer.

6.    The *Sixty Minutes* 2020 interview of President Trump  violated the MCPA because Sixty Minutes never revealed the material fact that 60 Minutes had reason to believe that the Hunter Biden laptop ("HBL") was genuine but correspondent Lesley Stahl *represented* repeatedly that there was no evidence the HBL was genuine and that the President knew that (i.e. Stahl was saying the President was lying repeatedly).

7.    This means CBS violated the MCPA in 2020 by failing to reveal facts material to the transaction (i.e. there was evidence the HBL was genuine) *in light of* representations of fact made in a positive manner (i.e. there was no evidence the laptop was genuine).

8.    The President's interview during the October 25th, 2020, *60 Minutes* was aggressive and hostile by Lesley Stahl who argued with the President using "facts" Stahl and Defendants knew were false.



"You Know That's Not True." - Lesley Stahl To President Trump.

9.      Ms. Stahl superciliously lectured the President with not only false arguments about the laptop, covid, the economy, Michigan Governor Whitmer, past statements by the President, and anything else that she could do to harm the President by either omission or commission. These facts are set forth more fully below in the "Facts" section.

10.     CBS also violated the MCPA in 2024 by representing the Kamala Harris interview was genuine when it was a "slice and dice" of other parts of the interview to deceptively make Kamala Harris seem more competent, intelligent, Presidential, and more hateful of Israel.



"I Give You My Word As A Biden." – 60 Minutes 2020 Biden Interview
09mm:13ss.

11.     In addition, Biden interviewer Norah O'Donnell never mentioned at
any time that there was credible evidence that the HBL abandoned at a repair
shop was genuine including references to bribes solicited and received by Hunter
and Joe Biden or numerous uses of the "N" word by Hunter Biden.

12.     The evidence that HBL was genuine was conveyed to CBS by
Catherine Herridge prior to the airing of the candidates interview and *prior to the
digital distribution of the interview by Defendants.*

13.    *The above material facts have still not been revealed to the Michigan consumer on any digital platform defendants are using to distribute the "60 Minutes" interview.*

## PARTIES

14.    Plaintiff HP BENSON INC is a Michigan non-profit in good standing.

15.    Defendant Paramount is a Delaware corporation with its principal place of business in New York, NY, operates as a media company, and is publicly traded on NASDAQ (PARA). Paramount owns CBS Broadcasting and CBS Interactive, and as such, has substantial control over CBS's commercial decisions and broadcast content.

16.    Paramount is a nonresident who engages in business in Michigan. Therefore, Paramount may be served via its registered agent for service in the State of Michigan.

17.    On July 7, 2024, Paramount announced a definitive agreement to merge with Skydance Media in a deal valued at eight billion dollars ($8,000,000,000). The company plans to form a new entity known as "New Paramount," which would have an estimated value of twenty-eight $28,000,000,000. If approved by federal regulators, the transaction would close in September 2025.

18.     Defendant CBS Broadcasting is a New York corporation with its principal place of business in New York, NY. 29. CBS Broadcasting is a nonresident who engages in business in this state.

## JURISDICTION AND VENUE

19.     For the reasons detailed in this Complaint, Defendants are subject to general personal jurisdiction in Michigan. Defendants own, operate, and affiliate with numerous broadcast stations throughout the state, including WWJ TV, Channel 62, which is received in Livingston County, through cable, satellite, and over the air.

20.     Defendants also affiliate with other broadcast stations throughout Michigan:

| | | |
|---|---|---|
| WNEM-TV | 5 | Bay City/Saginaw/Flint |
| WLNS-TV | 6 | Lansing |
| WWMT | 3 | Kalamazoo/Grand Rapids |
| WWTV | 9 | Cadillac/Traverse City |
| WWUP-TV | 10 | Sault Ste. Marie - Satelite of WWTV |

WBKB-TV                11                Alpena

and many others. Each of the broadcast stations that Defendants own and operate have their principal place of business in Michigan, conduct substantially all their business operations in Michigan, have employees whose knowledge will be relevant to this case within Michigan, and direct all their broadcasts at specific geographic regions within Michigan, including the broadcasts at issue in this litigation.

21.    Although some Defendants such as Paramount appear to additionally conduct business elsewhere and maintain offices in other jurisdictions, some of which may be relevant to this case, each of the Defendants has forged an enduring relationship with Michigan, regularly conducts business in Michigan, purposefully avails itself of the benefits of Michigan residence, and deliberately maintain continuous, systematic, and substantial business operations and contacts within Michigan.

22.    In the alternative, Defendants are each subject to specific personal jurisdiction in Michigan for the conduct underlying Plaintiffs' claims. Defendants have purposefully availed themselves of the privilege of conducting activities within Michigan, thus invoking the benefits and protection of its laws, and those activities have given rise to Plaintiffs' lawsuit for injunctive and declaratory relief.

23.    Defendants purposefully directed the broadcasts and online postings of the 2020 and 2024 "teasers, promotions and previews" ("Preview") and Interviews into Michigan for viewing by Michigan residents.

24.    Defendants maintain a network of directly and indirectly owned broadcast stations, and/or contract with broadcast affiliates, *as well as websites*, to ensure that every citizen of Michigan had access to the Interviews.

25.    Those Michigan broadcasts and online postings of the Previews, the Interviews, and the Election Specials and injured the Michigan pubic and will continue to injure the Michigan public.

26.    Undeniably, *Face the Nation*, *60 Minutes* and other CBS programs have significant viewership in Michigan generally and Livingston County Michigan in particular.

27.    The Previews and the Interviews were aired in Michigan, were posted online in Michigan, remain accessible to the public in Michigan, and have been and can be viewed by individuals in Michigan.

28.    The Interviews was aired in Michigan through the aforementioned CBS stations, affiliates and related websites distributing and providing the digital content in concert with other local affiliates that are owned, operated, or licensed by Defendants.

29.    Personal jurisdiction over Defendants is proper under MCL 600.711 because Defendants, during the operative period alleged in this Complaint,

engaged in substantial and not isolated business activities in Michigan, and more specifically, in Livingston County.

30.    Venue is proper in Livingston County under MCL 600.1621 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Livingston County  by virtue of the Interviews being transmitted by Defendants into this District through *Paramount+* and on *YouTube*, and CBS owned broadcast and digital platforms including WWJ TV Channel 62.

31.    Declaratory, and injunctive relief is warranted in this case for numerous reasons. First, this matter involves an active, actual controversy that is important to guide the behavior of the Defendants and Michigan Consumers. That controversy is whether or not the Media, including defendants, can use the First Amendment as a shield to protect them from liability when they engage in conduct that is deceptive, unconscionable, and unfair in their methods, acts, and practices, as Plaintiff alleges here.

32.    Defendants are already using the First Amendment as a Defense in ***Trump v. CBS Broadcasting Inc., Paramount Global, et al.,*** **No. 2:24-cv-00231-Z (N.D. Tex. filed Oct. 2024) ("Donald Trump Lawsuit")** and will use it in this action.

33.    That case involves a count based on a Texas statute quite similar to the MCPA.

34.    Attorney General Dana Nessel more fully discusses Declaratory

Judgements in *Dana Nessel, Attorney General of the State of Michigan, ex rel The People of the State of Michigan v. Eli Lilly and Company,* No. 165961 (Mich. Sup. Ct.).

35.    As discussed more further herein, the MCPA is the only weapon a Michigan consumer has to fight back against  harmful conduct by the media, and this Court should rule that the MCPA is a proper state regulation of the First Amendment right which is not absolute, which virtually no right is.

36.    This harmful conduct the MCPA is intended to regulate includes the epidemic of deceptive grooming and incitement to violence – including antisemitic and violence against minorities - resulting in many deadly acts of mass violence and school shootings, of course provided the other criteria for an MCPA action is met, which it often is.

37.    The *Nessel* case and others are seeking that the Supreme Court of Michigan (MSC) overturn the exemption from the MCPA that regulated industries benefit from, and Plaintiff seeks to be included in that relief should the rulings on regulated industries exemptions be overturned. This to the extent that a broadcast – and not the digital distribution of such content – is considered regulated.

## **FACTUAL ALLEGATIONS**

38.    The 2020 presidential election between incumbent President Donald Trump and former Vice President Joe Biden was extremely contentious, marked by record-high voter turnout, a global pandemic, and deep political polarization. The race was fiercely fought, with both candidates receiving historically high numbers of votes.

39.    On October 14, 2020, the New York Post (NYP) published a front-page story concerning the Hunter Biden laptop (HBL) which was found at a computer store in Delaware unclaimed. In the story the Post presented emails found on the laptop that allegedly showed possible influence peddling corruption by Joe Biden, and members of his family, to include Hunter Biden.

40.    The media in general dismissed the Hunter Biden laptop (HBL) story during the 2020 presidential campaign. This dismissal contributed to a lack of scrutiny over Hunter Biden's foreign business dealings which could have resulted in serious repercussions for the Biden campaign.

41.    In little more than 24 hours after the NYP HBL story ran, CBS quickly responded and interjected the possibility that the HBL story is information laundering (false) and/or a possible Russian disinformation operation.

42.    This begins a long campaign by CBS News/ CBS 60 Minutes as it highlights their bias which was exhibited through deceptive reporting, suppression of information and unfair treatment of one Donald Trump. This is not

lost on *some* members of the public as a few of the comments questioning CBS'

motives are listed below.


**@Tinman20737** 4 years ago
Its clear 60 minutes is biased to the point of fraud.


**@janieswanson2549** 2 years ago
Yeah it was verified.
60 minutes is fake news.


**@jamesdarnell1944** 9 months ago
Election interference


**@cook937** 4 years ago
does a media coverup make the news organizations complicit?


**@rap5374** 1 year ago
CBS is spreading misinformation 😂

43.   While CBS may defend its actions as editorial discretion, the facts

show a concerted, coordinated and politically protective suppression of legitimate

news, and is therefore unconscionable unfair and deceptive.

44.   The facts brought forward in this complaint highlight the coordination

at CBS News (to include 60 Minutes) just by the actions of the four 60 Minute

players; Lesley Stahl, Norah O'Donnell, Ingrid Ciprani-Matthews, and Bill

Whitaker. By **withholding verified reporting**, **concealing a contributor's**

**political role**, and **selectively editing content harmful to Joe Biden**, CBS

departed from fundamental journalistic norms.

45.   The findings of Media Tenor, who  reported that CBS's Trump 2020

coverage "can be summarized in a single sentence: **"it was the most negative**

coverage ever recorded for a television-age presidential nominee", should

be sufficient to show that someone was "cooking the books". These actions

collectively amount to **a pattern of deception, unconscionability, and**

**unfairness**—not merely through what CBS said, but what it refused to say.


## Background

46.    On October 14, 2020, the New York Post (NYP) published a front-

page story concerning the (HBL). In the story the Post presented emails found on

the laptop that allegedly showed possible influence peddling corruption by Joe

Biden, the Democratic presidential nominee and Hunter Biden's father.


47.    On October 15, 2020, the NYP published another article regarding a

business venture the Biden family had relating to China Energy. One of the

emails found on the laptop was from a Hunter Biden's business partner, Tony

Bobulinski, who described proposed equity shares of each of the investors in the

venture, ending with a reference "10 held by H for the big guy". The NYP

asserted the "big guy" was Joe Biden.


## It's Russian Misinformation - Norah O'Donnell and Nancy Cordes

48.    On a *CBS Evening News* segment with Norah O'Donnell and Nancy

Cordes on October 15, 2020, O'Donnell reports, during the lead-in, that the

Trump campaign is accusing social media companies of blocking the spread of an "**unverified**" story about former Vice President Joe Biden's son and a laptop. allegedly full of his old emails.

49.    O'Donnell states there is a question concerning its authenticity or more likely is it just designed to sow confusion in the final weeks of the election.

50.    Reporter Nancy Cordes then takes over the story and immediately says that "all the experts say the NYP story has the hallmarks of information laundering (i.e. disinformation).

51.    Cordes refers to the NYP article as coming from a ***"tabloid"*** newspaper.

52.    Cordes reports that the laptop was obtained by Rudy Giuliani who has been known to be trying to "dig up dirt" on the Bidens.

53.    Cordes introduces a former FBI operative who states that the HBL **looks like your classic Russian disinformation campaign**. She finishes her report by opining that the goal of these types of incidents is to cast a cloud over the front runner in the closing weeks of the campaign that creates a possible scandal.

**CBS Deception**

54.    It should be noted that Cordes, in little more than 24 hours after the NYP HBL story runs, quickly interjects the possibility that this story is information laundering (false) and a possible Russian disinformation campaign.

55.     Additionally, she failed to cover the information that NYP provided just 8 hours before her story announcing that Joe Biden was to receive 10% of the equity shares.

56.     Cordes also uses the term "**tabloid**" when referring to the NYP as way to marginalize the veracity of this newspaper. The NYP is currently the longest running newspaper in the country (1801) with the fourth largest print circulation.

57.     The NYP is published in a smaller book style format that is commonly referred to as a tabloid style. It is described as a conservative media outlet, but her intent here appears to be to downplay the credibility of the story. The byline at the bottom of the screen again refers to the NYP as a tabloid.



**BREAKING NEWS**
**HUNTER BIDEN TABLOID STORY RAISES DISINFORMATION CAMPAIGN FEARS**
**©CBS EVENING NEWS** WITH NORAH O'DONNELL

**CBS News story by Bo Erickson and Stefan Becket October 16, 2020**

58.     The story starts with the writers claiming that President Trump and his allies have launched a late effort to tarnish Joe Biden by tying him to his son's overseas business interests that supposedly came from an abandoned laptop. They then add that the timing of the Trump release is reminiscent of Russian efforts to dump damaging material about Hillary Clinton in 2016.

59.    The writers reported on their interview with John Paul MacIsaac, the owner of the computer store where the computer was recovered. They claim the interview was two hours long and that MacIsaac was unable and unwilling to answer questions about how the laptop supposedly arrived at the store. Further they claim that MacIsaac contradicted himself about his motivations, raising questions about his truthfulness. He also refused to provide key details about his interactions with Rudy Giuliani who initially took possession of the laptop.

**CBS Deception**

60.    This story was written as a hit piece on MacIsaac to minimize the impact of the HBL story. MacIsaac was under no obligation to answer the reporter's question, and their tone of this interview was blatantly unfair – which was their actual intent.

## CBS Evening News – Norah O'Donnell and Paula Reid – October 16, 2020

61.    In this segment O'Donnell reports that there are growing questions if Rudy Giuliani is being used by Russia to influence the upcoming presidential election.

62.    Reporter Paula Reid then takes over the story and reports Trump's attack on Biden, calling him part of an organized crime family. She notes that the President was referencing a **tabloid** newspaper story with emails reportedly **swiped** from Joe Biden's son Hunter.

63.    Reid then mentions that Twitter initially blocked re-tweets of any stories about the laptop. But as of this date Twitter removed the blocks against NYP.

**CBS Deception**

64.    There are several **deceptive comments** within this story. First, Reid refers to the NYP as a "**tabloid**". Second, she claims that the story, without naming the source, was concerned with emails "**swiped**" from the HBL.

65.    No information was ever reported that the emails and/or laptop were ever "swiped". Lastly, she reported that Twitter lifted the re-tweet blocks, but she failed to report and therefore concealed that Twitter continued their suspension of the NYP. The NYP suspension was not removed by Twitter until October 30, 2020.

### Michael Morrell – Retired Deputy CIA Director and CBS Associate

66.    Michael Morrell was a CIA career intelligence analyst who retired after 33 years' service. He was the Deputy Director of the CIA from 2010 to 2013 and twice as its acting director, first in 2011 and then from 2012 to 2013. In January 2014, upon retirement, Morrell joined CBS News as an on-air contributor on intelligence and national security.

67.    In 2018, CBS began producing Morrell's weekly podcast called *Intelligence Matters* that dealt with national security issues. Morrell is no longer

associated with the *Intelligence Matters* podcast but still does on-air commentary for CBS.

68.     In 2016 Morrell left his job at CBS so that he could write an op-ed supporting Democratic Nominee for President Hillary Clinton. In this op-ed he called Donald Trump "not only unqualified for the job, but he may well pose a threat to our nation". Following the election Morrell returned to his job at CBS.

## Biden Laptop and the 51 Intelligence Officers Letter
## Russian Misinformation

69.     According to testimony provided by Morrell to a Congressional Hearing in 2023, he relayed how the letter from intelligence officers (IO) developed. Morell testified that on or around October 17, 2020, Antony Blinken who served as a senior advisor to the Biden campaign, reached out to him to discuss the Hunter Biden laptop story that had run in the NYP.

70.     According to Morell, although his outreach was couched as simply gathering Morell's reaction to the NYP story, it set in motion the events that led to the issuance of the public statement.

71.     Later that same day, October 17, Blinken emailed Morell a news article published in USA Today alleging that the FBI was examining whether the Hunter Biden laptop was part of a "disinformation campaign." The article, titled "A **tabloid** got a trove of data on Hunter Biden from Rudy Giuliani. Now the FBI is probing a possible disinformation campaign", references a statement from former

IO Mike Carpenter who opines that this story might be Russian misinformation. Carpenter currently works for the Penn-Biden Center for Global Strategies and formerly was on Vice President Biden's White House staff.

72.    The very bottom of this email sent to Morell included the signature block for Andrew Bates, then-director of rapid response for the Biden campaign. His responsibility is to counter any detrimental attacks on his candidate. His name on this message demonstrates that the Biden campaign was already mounting some type of response to this situation. Note we already see a defense calling this story Russian misinformation and the NYP regularly referred to as a tabloid to defuse any fallout.

73.    On October 18, 2020, Morell contacts former IO Marc Polymeropouos and tells him "Someone from the "Biden world had asked for this letter". They both then began working with several associates from the intelligence community and crafted a letter to assist the Biden campaign. During this time, he had conversations with former top IO officials John Brennan and James Clapper concerning the wording of the document.

74.    James Clapper was identified as one person who edited the initial letter by recommending the wording of the warning to be "the laptop has all the classic earmarks of a Russian information operation".

75.    On October 19, 2020, after coordinating the creation of a public letter with clear political intent, CBS-affiliated intelligence analyst Michael Morell

obtained 51 signatories to the letter and then has the final narrative delivered to Natasha Bertrand, a  pre-selected journalist with a known history of favoring similarly politicized intelligence claims (2016 Steel Dossier).

76.    Also, during this congressional hearing it was learned that former IO Kristen Wood had sent an email to various IO's to solicit their support for the letter. Wood stated that the group intended that their public statement would help Vice President Biden's candidacy, specifically regarding the upcoming debate. "We think Trump will attack Biden on the issue at this week's debate and we want to offer perspectives on this from Russia watchers and seasoned experts".

77.    Morell testified that the Biden campaign helped develop a strategy as to the public release of the IO letter. Morell further explained that one of his two goals in writing and releasing the letter from former IOs was to help then-Vice President Biden in the debate to offset a Trump attack and to assist Biden in winning the election.

78.    Congresswoman Claudia Tenney (NY) in an interview stated that the intelligence letter was put together to help Joe Biden in the final debate. She said "Joe Biden said 51 intelligence agents wrote a letter stating that the laptop was Russian disinformation. That was deliberate. It was done for the sole purpose of giving Joe Biden a political edge in the debate. How is that not something that could potentially be a false statement? They (IOs) knowingly **deceived** the public by doing this.

79.    Following the debate Morrell received a congratulatory call from Biden Campaign Chair Steve Richetti thanking him for putting the letter together.

**Coordinated Network of Influence - Intelligence Officers to Media Platforms.**

80.    The Morrell letter came into existence through message synchronization across various platforms. This structure resembles a political-military-media ecosystem, not random editorial choices. This isn't coincidental - it looks like a real-time narrative correction operation, with CBS both echoing and helping drive the suppression.

81.    Many of the signatories of the Morrell letter held very high-power positions in the intelligence community before their retirement. Once retired, many IOs cross over into the news media world, a common revolving-door phenomenon.

82.    In 2018, Michael Morrell, in association with CBS News, began producing a weekly podcast called *Intelligence Matters* that dealt with national security issues. There have been close to 300 *Intelligence Matters* podcasts produced by Michael Morrell.

83.    Of the 51 signatories to the Morrell letter, 19 of them had been guest contributors to the *Intelligence Matters* podcast. Anthony Blinken was on the *Intelligence Matters* podcast with Morrell just three weeks before they reconnected concerning the HBL story.

84.    In October 2020 Miranda Devine, a NYP reporter, stated that the intelligence officer letter can only be seen as **partisan political propaganda** move designed to disparage the Post reporting of the story and stop the media from looking deeper into the laptop. It was a lifeline to Joe Biden. It came on the eve of his final debate against then President Trump. And Joe Biden relied entirely on that letter to combat Trump's attacks over his corruption.

85.    Continuing, she stated using the institutional weight of their powerful former roles they signed a letter which claimed the material on the Hunter laptop had all the classic earmarks of a Russian information operation. Although not one of the 51 IOs asked if they could see the laptop.

**CBS Deception**

86.    CBS, within the first few days following the NYP story, runs articles denying the story content and claiming it could be **Russian misinformation**. They also run a derogatory story concerning the computer repairman involved with the laptop.  Next, the Biden campaign seeded and shaped the Morrell letter and its media release. Lastly, CBS concealed conflicting internal findings such as the information presented by reporter Catherine Herridge (see below).

## Catherine Herridge – Former CBS Reporter

87.    Catherine Herridge is a long-time award-winning journalist, first with FOX News and later with CBS. Herridge covered the 2020 presidential campaign while employed with CBS News.

88.    Herridge claims that she had received directions from CBS CEO George Cheeks that Paramount Chairwoman Shari Redstone wanted her to probe the Hunter Biden laptop story. Cheeks told her on multiple occasions that this was a story of the highest priority for the network.

89.    Herridge claims that there was pushback inside the left-leaning network over her probe into the laptop of the president's son, and whether its contents revealed corruption by Former Vice President Biden.

90.    Herridge claims there were some elements within CBS News that were **very resistant to running the HBL story**. It didn't matter to them what the facts of the case really were.  Herridge claimed that her direct bosses, Washington bureau chief Mark Lima and CBS News president Ingrid Ciprian-Matthews, pushed back on her reporting, killing potential stories in the early days of the HBL scandal.

91.    Herridge reported that on October 23, 2020, she received a text message from Ingrid Ciprian-Matthews if she could verify the Biden laptop for Norah O'Donnell who was handling the Joe Biden interview. She replied that she had verified the laptop as being genuine and forwarded her documents to Ciprian-Matthews and O'Donnell.  O'Donnell did not use this information.




92.     On October 22, 2020, CBS ran a story titled "2020 Daily Trail Markers: Trump and Biden meet for the Final Debate" by Caitlin Conant. Within this story, Conant refers to information attributed to Catherine Herridge, that Tony Bobulinski, the Hunter Biden business partner, was invited to the final debate by President Trump.

93.     She also reported that Bobulinski was scheduled to be interviewed by Senate investigators the following day. This appears to be the only time Bobulinski was mentioned by CBS prior to the election.

94.     Herridge recalls on October 25, 2020, she watched the 60 Minutes program. She stated that she "felt sick" when she heard Lesley Stahl tell

President Trump multiple times that they could not discuss the Hunter Biden laptop story because it had **yet to be verified**.

95.  She claimed that during October 2020, CBS News management did not allow her story about verifying the Biden laptop ever to be aired.

## CBS Deception

96.  Catherine Herridge states that she told CBS News management that she could authenticate and confirm the HBL was genuine in October 2020, before the 60 Minutes interviews with Trump and Biden.

97.  She claims that CBS refused to allow her to run this story prior to the election.

98.  Further it appears that Defendant CBS management did not allow for this information to be used during the *60 Minutes* interviews with Donald Trump and Joe Biden. CBS' deception in this case is the fact that they concealed from the public the authenticity of the HBL that possibly could have been harmful to Joe Biden.

## <u>CBS Morning News – Anthony Mason – October 23, 2020</u>

99.  In this segment Anthony Mason is interviewing two reporters that were commenting on the previous night debate between Trump and Biden. At one point Mason states that during the debate Trump tried to paint Joe Biden as corrupt as he brought up "**unverified allegations**" about Hunter Biden's financial dealings.

**CBS Deception**

100.  At the time of this interview, CBS Reporter Catherine Herridge had already verified the HBL was genuine based on emails and documents that it contained. Herridge claims that she notified CBS management of these facts, yet CBS continued to **suppress the story** and refer to these allegations as **unverified**.

## CBS 60 Minutes - Lesley Stahl Interview with President Donald Trump

101.  On October 20, 2020, Lesley Stahl and her 60 Minutes crew interviewed Donald Trump at the White House.

102.  On October 25, 2020, CBS ran the 60 Minutes program containing interviews with both Trump and Biden. Lesley Stahl conducted the interview with Trump. Traditionally the incumbent must defend their record over the past four years and answer questions as to why they have not accomplished certain things.

103.  This interview quickly became very contentious. When Trump brought up the Hunter Biden laptop story and claimed it was a scandal for Joe Biden, Stahl responded that they could not talk about the laptop story because it was

**not verified**. A review of the video shows that she told Trump four times the laptop had **not yet been verified**.

**CBS Deception**

104.  At the time of this interview, CBS Reporter Catherine Herridge had already verified the HBL was genuine based on emails and documents that it contained. Herridge claims that she notified CBS management of these facts.

105.  Later in the interview Trump again brings up issues concerning the financial gift the Moscow Mayor's wife gave to Hunter Biden, the salary he made with Burisma and some financial connections to China. All which Trump believes reflects poorly on Joe Biden. Stahl at this time continued to insist that none of that information was **verified**. This exchange was **edited out of the final cut** of the 60 Minute program broadcast. But the White House has the actual footage.

**CBS Deception**

106.  At the time of this interview, CBS Reporter Catherine Herridge had already verified the HBL was genuine based on emails and documents that it contained. Herridge claims that she notified CBS management of these facts.

107.  Here is a breakdown of deceptive and unfair conduct by CBS 60 Minutes and their reporter Lesley Stahl. First is the review of the **actual footage CBS broadcast** that was presented to the American public.

108.   To start the program Lesley Stahl introduction immediately claims at 00:45 that the Trump interview had become an all too common "public dust-up" that regrettably ended up very contentious.

109.   At 11:35 Stahl accused Trump of going after Michigan Governor Gretchen Whitmer by saying at a recent rally "lock her up". Trump denies he made that remark.

110.   Stahl comes back saying but you did go after her, you criticized her. Trump admits he did go after Whitmer and criticized her for the way she shut down her state during the COVID pandemic. Stahl's response "that is going after her".

**60 Minute Deception**

111.   Stahl's attack on Trump was that by Trump "going after Whitmer" and criticizing her can lead to violence and puts her in danger. Stahl mentions the plot to kidnap the governor could have been hatched by his aggressive rhetoric. This paints Trump as a powerful and dangerous individual.

112.   At 13:41 Trump claims Biden gets easy questions from the press. He then goes on to say he (Biden) is in the midst of a scandal (HBL). Stahl replies "[H]**e's not, no, come on**".

**60 Minute Deception**

113.   According to Catherine Herridge, she had already confirmed that HBL was genuine. She has said that she made this information available to CBS management (Ingrid Cipriani) prior to this 60 Minutes interview taking place (October 23rd).

114.   At 13:50 Trump alleges that they spied on his 2016 campaign. Stahl responds **there is no real evidence. No.** "**This is 60 Minutes, and we cannot put things on we cannot verify**". She repeats two more times this **could not be verified.**

**60 Minutes Deception**

115.   CBS blatantly disregarded their own reporting into the spying investigation of Donald Trump's campaign in 2016. There is plenty of evidence that the FBI did spy (investigate) on the Trump 2016 campaign. First the investigation was initiated on July 31, 2016, and called Crossfire Hurricane.

116.   Said investigation was opened as a counterintelligence investigation into the Trump campaign. There were three targets George Papadoppoulos (Crossfire Typhoon), Michael Flynn (Crossfire Razor), and Paul Manafort (Crossfire Furry).

117.   This investigation utilized typical law enforcement actions (review of bank records, phone records, and other financial data). The FBI tasked multiple

informants to interact with the targets in an undercover capacity.  The FBI colluded with the CIA and shared information.

118.  Later the FBI obtained FISA warrant(s) to surveil campaign advisor Carter Page and others.

119.  Below is a list of articles/news segments produced by CBS concerning the FBI spying/investigation of the Donald Trump 2016 campaign.



120.  On February 14, 2019, CBS reporter Norah O'Donnell interviewed 60 Minutes moderator Scott Pelley about his upcoming interview with former Assistant Director of the FBI Andrew McCabe. Pelley reports that in the 60 Minutes segment to run the following weekend, McCabe explains his reasoning for launching investigations against the Trump campaign.



**Andrew McCabe: Rod Rosenstein brought up 25th Amendment**

60 Minutes ✓    Subscribe    👍 646  👎    ↱ Share    ⬇ Download    ...
3.71M subscribers

141,562 views  Feb 17, 2019

121.  On February 17, 2019, Former Acting FBI Director Andrew McCabe is featured on a 60 Minutes segment with Scott Pelley. In this interview McCabe details that he and Deputy Attorney General Rod Rosenstein discussed wearing a "wire" (recording device) to a meeting with the newly elected President. McCabe had indicated that the suggestion to record the President was part of a broader conversation about safeguarding the investigations. The recording of the President did not happen.

122.  Further in this same 60 Minutes segment, McCabe tells Scott Pelley that he and Deputy General Rob Rosenstein did discuss the possible use of the 25th Amendment against Donald Trump. Meaning the actual removal of the President of the United States from office.



Scott Pelley calls Andrew McCabe 60 Minutes interview "astonishing"

60 Minutes
3.7M subscribers   Subscribe    1.3K    Share   ...

188,110 views  Feb 17, 2019

123.  Following this interview with McCabe, CBS ran a social segment titled 60 Minutes Overtime. This segment is coordinated and produced by the same editorial team that manages the primary 60 Minutes broadcast. This includes the same producers and correspondents.

124.  In this special segment Scott Pelley comments on how the story told by McCabe concerning the two investigations into the Trump campaign was just "astounding".

125.  Accompanying Pelley in this segment is senior producer of the CBS News Innvestigative Unit Pat Milton. Milton comments that McCabe was known as an "extraordinary agent in the FBI" and that is why 60 Minutes wanted to interview him to give him an opportunity to tell his side of the story.



**McCabe says possible "inappropriate relationship" between Trump, Russia prompted probe**



126.  Earlier on February 17, 2019, the CBS Sunday morning show Face the Nation moderated by Margaret Brennan addresses Andrew McCabe's reasoning for opening two investigations looking into the Trump 2016 campaign. To start this segment Brennan plays the 60 Minutes clip where McCabe states that there was a possible inappropriate relationship between Trump and Russia and that is what prompted the probe. Brennan then asks Senator Lindsay Graham "listening to what McCabe just described is a troubling pattern of behavior. Can you understand why he came to that conclusion?



127.   On December 19, 2019, Catherine Herridge, et al, wrote a CBS story titled "Justice Department Watchdog Releases Report on Origins of Russia Investigation".

128.   The opening paragraph states, "A Justice Department review into the origins of the **FBI investigation** into possible ties between the Trump campaign and Russian interference in the 2016 election found several procedural errors but overall, no "political bias" by the agency.



**His side: Peter Strzok speaks**

CBS Sunday Mo... ✓    Subscribe        👍 1.4K   👎    ↗ Share   •••
1.72M subscribers



123,885 views  Sep 6, 2020

129.  On September 6, 2020, just weeks before the Lesley Stahl interview

with then President Trump, the CBS Sunday Morning News program conducted

an interview with former FBI agent Peter Strzok. National security correspondent

David Walsh asks Strzok, "You're the guy that writes the official document that

opens this investigation?"

130.  Strzok admitted he was the **FBI agent who started it all – opening**

**the investigation into Donald Trump's campaign** three months before the

2016 presidential campaign.


**60 Minutes Deception**

131.  **CBS blatantly disregarded their own reporting** into the spying

investigation of Donald Trump's campaign in 2016. The FBI did conduct and

spy/investigate certain members of the Trump campaign in 2016. CBS

themselves produced at least six segments referring to the FBI investigation against Trump. So how does Lesley Stahl claim that there is no real evidence of the FBI spying on his campaign? She says to Trump (14:07) "this is 60 Minutes, and we cannot put on things we cannot verify."

132.   But the massive cover-up framed by CBS is highlighted by their concealment that the investigation took place at all. Hiding or denying this information provides cover to the politically driven actions of the previous Democratic administration and campaign operatives.

133.   At 15:30 Trump stated that he saw Stahl interview Joe Biden. He states in that interview he saw her question him using softball questions.  Stahl denied ever interviewing Biden.

## CBS Deception

134.   Lesley Stahl did interview then Vice President Joe Biden for a 60 Minutes program on April 26, 2009.  This is another attempt to demean and/or paint *Trump* as a liar.

## White House Copy of 60 Minutes Interview (Facebook)



Look at the bias, hatred and rudeness on behalf of 60 Minutes and CBS....

135.  On October 22, 2020, the White House released the unedited copy of the video containing the Lesley Stahl 60 Minutes interview with Trump that had taken place on October 20, 2020. It was released on Facebook before its scheduled broadcast that coming Sunday.

136.  In the White House video (6:32) Stahl stated that suburban women don't trust him. She also said you are probably behind in the polls.

137.  Trump's response was that suburban women love him because he brings safety and security to the suburbs.

138.  Trump also mentioned he had been endorsed by every police department and almost every law enforcement group in the country. Trump

claimed that Biden has not received any of these endorsements. President

Trump ended his response again with the fact suburban women want safety.

**CBS Deception**

139.   The response by Trump could be viewed as positive to his campaign

so therefore CBS edited it out of the final program.

140.   Later in this video (between 20:30 and 23:00) there is a long

discussion driven by Trump's allegation that the Bidens are corrupt. He calls

Biden a corrupt politician.

141.   President Trump then goes on to list several examples that can be

attributed to the HBL such as: (1) the gift of millions of dollars from the wife of the

Mayor of Moscow; (2) the  salary he made with Ukrainian energy company

Burisma; (3) 10% for the "big guy"; and (4) financial connections to China.

142.   All the above Trump believes reflects poorly on Joe Biden. Stahl

during this time continued to insist that **none of that information was verified.**

**CBS Deception**

143.   The allegations brought forward by Trump concerning the corrupt

Biden family could be viewed as damning towards Biden and therefore they had

to be **edited from the final program in accordance with 60 Minutes**

**unconscionable, unfair, and deceptive methods , acts, and practices in**

**violation of the MCPA.**

## 60 Minutes Interview with Joe Biden

144.  Following the Lesley Stahl and Donald Trump interview 60 Minutes presented Norah O'Donnell's interview with candidate Joe Biden which took place in Wilmington, DL. The tone of the interview was very different.

145.  At 12:40 of this interview, O'Donnell asks Biden if he believed recent leaked material from the HBL and reported by a **tabloid** is part of a Russian **disinformation campaign**.

146.  Biden's answer started by saying the intelligence community had already warned of a possible Russian disinformation campaign during the election cycle (Morrell letter). He finished his answer saying that blending the Russians, Rudy Giuliani, and Trump results in a smear campaign against Joe Biden.

147.  *This was the only mention of the HBL in the entire 20-minute interview.*

**CBS Deception**

148.   CBS failed to follow up with any additional questions concerning the HBL situation that night. This limited (concealed) any coverage of what was on the HBL and whether that information might compromise Joe Biden as the next president.

149.  Even the relatively few corrections by Norah O'Donell of what Biden said (She corrected Biden about *North* Korea, a minor correction about the China

trade deficit, and that Biden's budget could pay for college for all.) provided cover for the totality of the unconscionability, unfairness, and deception the interview represented.

150.   On October 22, 2020, the final presidential debate took place with an NBC moderator. At one point in the debate Trump fired off allegations concerning the HBL. Biden **refers to the Intelligence Officers letter during debate and misrepresents it**. He incorrectly states "Look, there are 50 former national intelligence folks who said that what this is a Russian plan".

151.   On November 3, 2020, the presidential election takes place, and Joe Biden is declared the winner.

## Timed Silence: Post Election Corrections

152.   When the *New York Times* and *Washington Post* independently authenticated the laptop in March 2022, CBS remained silent. It wasn't until after the 2022 midterm elections—seven months later—that CBS finally acknowledged the laptop's authenticity.

**CBS Deception**

153.  The timing of this acknowledgment, like the earlier suppression, aligns conspicuously with electoral cycles and points to a deliberate effort to limit potential political damage to Democratic candidates.

154.  Catherine Herridge claims that **CBS purposedly held off with this announcement until after the mid-terms for political purposes**.

## Catherine Herridge – Post 2020 Election

155.  In November 2022, following the mid-term elections, CBS ran a story that the HBL was genuine. This was seven months after most mainstream media accepted the fact that the laptop was genuine. Herridge argued that the story was ready to go much earlier and that the story airing should not be dictated by the political cycle.

156.  Herridge pointed out that she proposed two stories to CBS management after receiving their own confirmation about HBL. The first story she proposed concerned the liberal use of the N-word by Hunter Biden in many of his text messages that were found on the hard drive. She was told that this story was "**not an interest to CBS News**". The next story that she proposed concerned a half dozen emails found on the HBL that may have been used by Joe Biden. She claims that **CBS never ran the story**.

## CBS Deception

157.  CBS management was not interested in running these stories because they were harmful to the Democratic Party.

158.  On April 21, 2023, Herridge did a CBS Evening News story concerning former Biden campaign official Antony Blinken's association with Michael Morrell, who orchestrated the 51 Intelligence officers letter claiming the HBL was possibly a Russian disinformation campaign. Herridge reached out to Morrell, a CBS associate, to answer some questions for the story, but he declined to comment.

159.  On May 10, 2023, Catherine Herridge did a story on CBS concerning a recent release of House report concerning the 51 Intelligence officers who signed a letter claiming the HBL was possibly a Russian disinformation campaign.

160.  Herridge has said that she thought this letter was a very dangerous intersection between the intelligence community and the political cycle. She claimed in the story that Michael Morrell did not respond to CBS News questions.

## CBS Strategic Editing and Recurrent Suppression

161.  During the October 2020 *60 Minutes* interview, Donald Trump made multiple allegations concerning Hunter Biden's foreign business dealings—mentioning the Moscow mayor's wife, Burisma, and Chinese companies. These were cut from the final broadcast, and Stahl's rebuttal **framed the laptop as dubious and unverified**. The uncut footage, later released by the White House, revealed that **CBS had edited out allegations that were later proven credible**.

162.  This editorial decision, led in part by Cipriani-Matthews, mirrors a now-familiar pattern. In 2024, CBS again came under fire for allegedly editing an

interview with Vice President Kamala Harris, which critics say removed segments that could reflect poorly on her interview performance, and that even could be construed as less hostile to Israel.

163.  Notably, Cipriani-Matthews had been reassigned as a senior advisor for CBS 2024 presidential election coverage following the November 2022 mid-term elections thus further reinforcing concerns about recurring bias and manipulation at the network, i.e., unconscionable, unfair, and deceptive, methods, acts, and practices by 60 Minutes.

164.  Further, according to Catherine Herridge. CBS had some very strict controlling guidelines they used for interviews, Herridge mentioned an interview she was trying to schedule with Elon Musk. CBS executives told her the following:

165.  Well, we can't do it live. We don't know what he's going to say.   She responded, Isn't that the point of journalism? You don't know what the person is going to say. Then they said it must be taped. We must have the ability to edit it. It must be on our platform. We must control the platform. Herridge advised her interview with Elon Musk never took place.

## POST ELECTION STUDIES - 2020

166.  After the 2020 U.S. presidential election, significant outrage emerged among many voters, particularly conservatives, due to the belief that the media and

major tech platforms had deliberately suppressed or discredited the HBL story to protect Joe Biden's campaign.

167.   Several major news outlets either ignored the story or referred to it as "Russian disinformation." CBS, CNN, MSNBC, and *The New York Times* were all criticized for either failing to cover the allegations in detail or questioning the legitimacy of the story until long after the election. Critics argued this constituted a de facto conspiracy to misinform voters and protect Biden.

168.   Several polls conducted after the election suggested that a significant percentage of Biden voters were unaware of the Hunter Biden laptop story, and that some may have changed their vote had they known. Critics used these findings to argue that the suppression may have affected the election outcome. Below are three polls taken after the election.

## Media Research Center (MRC)

169.   Found that 17% of Biden voters would not have voted for Biden had they been aware of the HBL story.

## Technometric Institute of Policy and Politics

170.   Found that 79% of respondents believed that "truthful" coverage of the HBL story would have changed the outcome of the 2020 election.

## Rasmussen Poll

171.  This poll reported that 48% of respondents said that if the media had fully reported the HBL before the 2020 election, it would have been unlikely Joe Biden would have been elected President.

**Early Voting**

172.  As stated previously, the 60 Minute interviews would likely have affected early voting, such as in Michigan, which Biden stated in the 2020 interview was heavy. This means the unlawful, unconscionable, deceptive and unfair 2020 interviews *likely caused Biden to be elected*.

## CBS Unfairness During 2020 Election Coverage

**Harvard-Kennedy School, Shorenstein Center on Media**

173.  According to the Shorenstein Center on Media's "A Tale of Two Elections," research CBS's 2020 general election coverage was 89% positive and 11% negative for Biden, but only 5% positive and 95% negative for Trump. This represents the most positive coverage ever recorded for a television-age presidential nominee (Biden) and the most negative for any nominee (Trump).

174.  Trump received four times as much coverage as Biden on CBS, but the tone was overwhelmingly negative. Biden was "nearly invisible" for long periods during the campaign, and when covered, the stories were largely positive.

175.  This study demonstrates a clear imbalance in CBS's 2020 general election coverage, with Biden receiving unprecedentedly positive coverage and Trump the most negative ever recorded. This unfairness can be attributed to the mechanics of reporting, journalistic discretion, editorial priorities, and the unique context of the 2020 race.

**Media Tenor**

176.  Media Tenor reported that CBS's Trump coverage "can be summarized in a single sentence: it **was the most negative coverage ever recorded for a television-age presidential nominee**". They went on to report that Trump's CBS coverage was 95% negative and to 5% positive.

177.  The Biden coverage reported by Media Tenor showed that he had received 61% positive coverage to 39% negative coverage.

**CBS Strategic Editing and Recurrent Suppression**

178.  During the October 2020 *60 Minutes* interview, Donald Trump made multiple allegations concerning Hunter Biden's foreign business dealings—mentioning the Moscow mayor's wife, Burisma, and Chinese companies. These

were cut from the final broadcast, and Stahl's rebuttal **framed the laptop as dubious and unverified**. The uncut footage, later released by the White House, revealed that **CBS had edited out allegations that were later proven credible**.

179.  This editorial decision, led in part by Cipriani-Matthews, mirrors a now-familiar pattern. In 2024, CBS again came under fire for allegedly editing an interview with Vice President Kamala Harris, which critics say removed segments that could reflect poorly on her performance. Notably, Cipriani-Matthews had been reassigned as a senior advisor for CBS 2024 presidential election coverage following the November 2022 mid-term elections thus further reinforcing concerns about recurring bias and manipulation.

## CBS Deception

180.  While CBS may defend its actions as editorial discretion, the facts suggest a concerted, coordinated and politically protective suppression of legitimate news. The facts brought forward in this complaint highlights the coordination at CBS News (to include 60 Minutes) just by the actions of the three 60 Minute players; Lesley Stahl, Norah O'Donnell, and Ingrid Ciprani-Matthews.

181.  By **withholding verified reporting**, **concealing a contributor's political role**, and **selectively editing content harmful to one candidate**, CBS departed from fundamental journalistic norms. The findings of Media Tenor, who reported that CBS's Trump 2020 coverage "can be summarized in a single

sentence: it **was the most negative coverage ever recorded for a television-age presidential nominee**", should be sufficient to show that someone was "cooking the books". These actions collectively amount to **a pattern of deception**—not merely through what CBS said, but what it refused to say.

182.   The public must be informed of the earth-shattering consequences of Defendants deceptive illegal actions in covering up for their "anointed" Democrat candidates. These consequences Defendants contributed to include:

A demented President not fit for office becoming President.

Unelected individuals performing Presidential duties.

President Trump losing the 2020 election for reasons - explained herein - including the 2020 interview affecting early voting including Michigan.

183.   Any *person* can ask for injunctive and declaratory relief per MCL 445.911 which provides:

(1) Whether or not a person seeks damages or has an adequate remedy at law, a *person* may bring an action to do either or both of the following:
   (a) Obtain a declaratory judgment that a method, act, or practice is unlawful under section 3.
   (b) Enjoin in accordance with the principles of equity a person who is engaging or is about to engage in a method, act, or practice that is unlawful under section 3. [Emphasis added]

184.   *A person* is defined under the MCPA to include a corporation such as Plaintiff. MCL 445.902(1)(d).

185.   The above is consistent with the legislative intent to enlarge the Michigan consumer's ability to enforce the statute's goal of remediating deception.

186.   Although the corporate purpose is not relevant for standing to sue, the corporate purpose of Plaintiff reinforces the standing to ask for injunctive and declaratory relief:

> "To educate the public regarding media that contains, and entities. and individuals that promote, deceptive: Hateful content; Inappropriate sexual content; Terrorist messages; and other deceptive offensive content.
>
> To engage in legal opposition, including lawsuits opposing the deception and deceptive content described above."

187.   The deceptive illegal media promoted by 60 Minutes forms the basis for this lawsuit for a number of reasons.

188.   First, there is deceptive advertising and promotion of the 60 Minute interviews in 2020, 2024.

189.   Advertising and promotion are covered under the MCPA in MCL 445.902(1)(g):

> "(g) "Trade or commerce" means the *conduct* of a business providing goods, property, or service primarily for personal, family, or household purposes and includes the *advertising*, solicitation, offering for sale or rent, sale, lease, or distribution of a service or property, tangible or intangible, real, personal, or mixed, or any other article, or a business opportunity."

190. The 60 Minute broadcast and digital media is also covered under the MCPA as a "distribution of a service or property", *Id.*

191. Plaintiff's counsel ("Counsel") properly pioneered using alleged illegal deceptive films and advertising of those films as a basis for MCPA complaints, primarily dealing with deceptive antisemitism. This, starting in 2011 with the antisemitic motion picture *Drive* (2011), and continuing with the 2014 antisemitic video/advertisement by the antisemitic Nike corporation *The Last Game* (2014) still being promoted and has already promoted billions of deceptive illegal antisemitic messages.

192. Counsel also used the MCPA against the antisemitic video/Ad *Hebrews to Negroes* (H2N) sold and promoted by Amazon despite violating its terms of service, and despite promoting criminal violence against Jews.

193. Jews are being harassed, beaten up, and assaulted every day in America because of the "fake Jew" incitement of H2N.

194. The MCPA clearly provides for such action including the instant case for a number of additional reasons.

195. First the MCPA is to be construed liberally because it is a public protection remedial statute. See *Price v. Long Realty, Inc.,* 199 Mich.App. 461, 471; 502 N.W.2d 337 (1993): "This Court has made clear that "the MCPA is a remedial statute designed to prohibit unfair practices in trade or commerce, [and] it must be liberally construed to achieve its intended goals." See also *Dix v Am*

*Bankers Life Assur Co of Florida*, 429 Mich 410, 417 (1987): The MCPA is to be "construed liberally to broaden the consumers' remedy."

196.  Second, the MCPA specifically provides an exemption for liability for media:

> "(b) An act done by the publisher, owner, agent, or employee of a newspaper, periodical, directory, radio or television station, or other communications medium in the publication or dissemination of an advertisement unless the publisher, owner, agent, or employee knows or, under the circumstances, reasonably should know of the false, misleading, or deceptive character of the advertisement or has a direct financial interest in the sale or distribution of the advertised goods, property, or service."

197.     For the Court to carve out an additional exemption for a media product or broadcast would violate the principal of rendering the plain language of the statute nugatory or surplusage. See *Sau-Tuk Indus, Inc v Allegan County*, 316 Mich App 122, 143; 892 NW2d 33 (2016). Courts "may not speculate regarding legislative intent beyond the words expressed in the statute." *Id.* at 145." Courts must "avoid an interpretation that would render any part of the statute surplusage or nugatory." *State Farm Fire and Cas Co v Old Republic Ins Co,* 466 Mich 142, 146 (2002). A court "may not rewrite the plain statutory language or substitute its own policy decisions for those decisions already made by the Legislature." *Slis v Michigan,* 332 Mich App 312, 336 (2020). See also MCL 8.3a: "All words and phrases shall be

construed and understood according to the common and approved usage of the language..."

198.  Defendants cannot use a First Amendment defense for the illegal deceptive 60 Minutes broadcasts, digital distribution, and advertising/promotions complained of herein, because all are commercial speech and misleading and false commercial speech does not get First Amendment protection. See *Central Hudson Gas & Elec. v. Public Svc. Comm'n,* 447 U.S. 557 (1980).

199.  The 2020 and 2024 interviews are commercial speech because 60 Minutes' candidate interviews are only done shortly before presidential elections. They uniquely promote the 60 Minute brand and enhance advertising revenue. The interviews create false misleading content by the acts, methods, and practices described herein.

200.  The bias and deception against President Trump and used to benefit his opponents in the 2020 and 2024 interviews as set forth herein are material facts.

201.  *Free transactions* are recognized by virtually every Court in Michigan as being covered by the MCPA and is now the way Michigan Courts – both state and federal - handle the *conduct* of a consumer business. See *Action Auto Glass v. Auto Glass Specialists*, 134 F. Supp. 2d 897, 901 (W.D. Mich. 2001) which rejects a transaction requirement – as defined by old case law that ignores the intent of the MCPA, and by some previous trial courts and non-precedent

unpublished court of appeals opinions - including for the following reasons enunciated by Judge Quist:

> By its terms, the definition of *"trade or commerce"* focuses on "the *conduct of a business providing [consumer] goods, property, or service*," rather than upon the occurrence of a specific transaction between the plaintiff and the defendant. M.C.L. § 445.902(d). Such conduct includes "advertising, solicitation, offering for sale or rent, sale, lease, or distribution." *Id. There is no requirement that consumer goods be sold or purchased in order to constitute "trade or commerce,"* although a sale of consumer goods or services is an example of conduct constituting "trade or commerce." [Emphasis Added].

202.  There is no question that 60 Minutes is a consumer business consistent with the above case and statutory definition, and all of the other recent Michigan cases both federal and state.

203.  The Trump Lawsuit raises the issue of antisemitism by CBS, paras 15, 16, and 17.

204.   This Court cannot allow hatred of President Trump, or hatred of Jews to be associated with the constraint of a viable Michigan statute – the MCPA - that is critical to America maintaining sanity and its foundation in the face of deceptive media posing an existential threat to our republic , as is alleged herein.

205.  Defendants deceptively promoted and "teased" the 2020 and 2024 interviews, thus violating the MCPA MCL 445.903(1)(cc).

## COUNT I

### *Violation of the MCPA* MCL 445.903(1)(s):

"(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer."
(Plaintiff v. All Defendants)

206.  Plaintiff realleges their allegations contained in paragraphs 1 through 205 as if set fully forth herein.

207.  The material facts that Defendants failed to reveal are that Defendants rigged the 2020 60 Minutes interviews in an unconscionable, deceptive, and unfair way by their methods, acts and practices, to make President Trump appear to be a liar regarding his supported allegations that the HBL was genuine, that the "N" word references were contained on the laptop, and that the payoffs to Joe Biden were credible.

208.  Other material facts that Defendants similarly failed to reveal are that Defendants rigged the 2020 60 Minutes interviews in an unconscionable, deceptive, and unfair way by their methods, acts and practices, to make President Trump appear to be a liar regarding his supported allegations that the Government spied on his campaign and criminally investigated the President which CBS already had reason to believe was true.  Include the HBL was genuine, that the "N" word references were contained on the laptop, and that the payoffs to Joe Biden were credible.

209.  Other material facts that Defendants similarly failed to reveal are that

Defendants rigged the 2020 60 Minutes interviews in an unconscionable, deceptive, and unfair way by their methods, acts and practices, by editing out everything the President said in his defense, to harm the President.

210.  Other material facts that Defendants similarly failed to reveal are that Defendants rigged the 2020 60 Minutes interviews in an unconscionable, deceptive, and unfair way by their methods, acts and practices, to help defeat the President in the 2020 election. This by Lesley Stahl constantly attacking the President and acting as a persecutor for the Democrat party, rendering the 2020 Sixty Minute interview an infomercial for the Democrat party.

211.  Other material facts that Defendants similarly failed to reveal are that Defendants rigged the 2020 60 Minutes interviews in an unconscionable, deceptive, and unfair way by their methods, acts and practices, to help defeat the President in the 2020 election. This by Norah O'Donnell in contrast to Lesley Stahl, asking questions to Joe Biden to help him promote his agenda in a biased manner helping Biden appeal to voters. Upon information and belief this included editing Biden's answers to help him win the election and cover up his dementia. Also, upon information and belief, this included giving Biden the questions to be asked or significant information about the questions to be asked, unlike President Trump who was given nothing in advance.

212.  Other material facts that Defendants similarly failed to reveal are that Defendants rigged the 2024 60 Minutes interview in an unconscionable,

deceptive, and unfair way by their methods, acts and practices, to help defeat the President in the 2020 election. This by Whitaker and 60 Minutes editing Kamala Harris' answers and the questions asked of her to make her seem more intelligent, less – to coin a phrase - "word salady" and more anti-Israel.

213.  "Reasonably known" is a jury question but presumably most people are not sophisticated or knowledgeable regarding media tricks.

## COUNT II
### Violation of the MCPA MCL 445.903(1)(cc):

"(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.
(Plaintiff v. All Defendants)

214.  Plaintiff realleges their allegations contained in paragraphs 1 through 213 as if set fully forth herein.

215.  In the promos, lead-ins and teasers Defendants fail to reveal that the 2020 and 2024 promotions make representations about 60 Minutes 2020 and 2024 interviews. However, in light of those representations of fact (i.e. Defendants representing it is an interview), Defendants fail to disclose that there are no interviews but rather staged , rigged and synthesized media creations for the purpose of harming President Trump and unfairly, unconscionably, and

deceptively helping Joe Biden win the election and defeat President Trump. This is material as alleged.



216.  On Sunday, October 6, 2024, Defendants broadcast and posted online a brief promotional excerpt of the Interview (the "Preview") for the commercial and pecuniary purpose of advertising and previewing the Election Special. This occurred during CBS's *Face the Nation,* when host Margaret Brennan advertised the Election Special by introducing the Preview, describing it as being from a "special election edition of *60 Minutes,*" with "our Bill Whitaker" who "sat down with Vice President Harris and asked her about U.S. influence with Israeli Prime Minister Benjamin Netanyahu."

## <u>RELIEF REQUESTED</u>

**PLAINTIFF** respectfully requests the declaratory relief requested herein, and that an injunction be issued requiring that the 2020 and 2024 60 Minute interviews contain a notification to the viewer that these interviews violate the MCPA.

Furthermore, Plaintiff respectfully requests that any change in the law regarding regulated industries/businesses being exempt from the MCPA be applied to Plaintiff for their benefit. Plaintiff also requests that Defendants pay for and provide public service announcements to undue the damage it has caused including the damage to the public and President due to their violations of the MCPA and antisemitism as referenced in the Trump Lawsuit, which is an appropriate form of injunctive relief.

Furthermore, Plaintiff requests any other relief the Court deems justified.

Date: July 1, 2025

Respectfully submitted,


Martin H. Leaf (P43202)

*Martin Leaf*

Martin H. Leaf
Attorney for Plaintiff HP Benson

STATE OF MICHIGAN
IN THE LIVINGSTON COUNTY CIRCUIT COURT


HP BENSON ASSOCIATION INC., a Michigan nonprofit,

    Plaintiff.

-v-

PARAMOUNT GLOBAL d/b/a
PARAMOUNT, a Delaware corporation, CBS
BROADCASTING INC., a New York corporation, and CBS
INTERACTIVE INC., a Delaware corporation,

    Defendants.

Case: 25-32852- CZ
Hon:
    JUDGE McGIVNEY
    P-63325

---

Martin H. Leaf (P43202)
Counsel for Plaintiff
33228 W 12 Mile Rd #345
Farmington Hills, MI 48334
248.687.999
leafmartin@gmail.com

---

**JURY DEMAND**

Plaintiff demands a jury for all matters that a jury can be employed.


Date: July 1, 2025
Respectfully submitted,
Martin H. Leaf (P43202)
/s/ Martin H. Leaf                     ,
Martin H. Leaf
Attorney for Plaintiff HP Benson

FILED
LIVINGSON COUNTY CLERK
2025 JU -1 PM 4:35